FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA.

2024 SEP 27  A 11: 51

CAROL L. MICHEL



24-00222

SECT.AMAG.3

**FELONY**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

### INDICTMENT FOR CONSPIRACY TO COMMIT
### WIRE FRAUD, CONSPIRACY TO COMMIT HONEST SERVICES FRAUD,
### WIRE FRAUD, AND HONEST SERVICES FRAUD

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. | |
| v. | * | SECTION: | |
| RANDY A. FARRELL, SR. | * | VIOLATIONS: | 18 U.S.C. § 1343 |
| IECI & ASSOCIATES LLC | * | | 18 U.S.C. § 1346 |
| | | | 18 U.S.C. § 1349 |
| * * * | | | |

The Grand Jury charges that:

### COUNT 1
(Conspiracy to Commit Wire Fraud)

**A.    AT ALL TIMES MATERIAL HEREIN:**

1.    Defendant, **RANDY A. FARRELL, SR. ("FARRELL")**, lived in Jefferson Parish, within the Eastern District of Louisiana.

2.    **FARRELL** co-owned and operated **IECI & ASSOCIATES LLC ("IECI")**, an inspection business, from in or around January 2007 to the present. **IECI** maintained its principal

√ Fee __USA__
___ Process_____
X Dktd_____
___ CtRmDep_____
___ Doc.No._____

places of business in the Eastern District of Louisiana and was incorporated in Louisiana. **FARRELL** and **IECI** maintained checking and credit card accounts with JPMorgan Chase Bank, N.A. ("Chase").

3.     The City of New Orleans was a local government and a political subdivision of the State of Louisiana located within the Eastern District of Louisiana.

4.     Under the Code of the City of New Orleans (hereinafter, "City Ordinance") Chapter 26 Section 15:2703, every electrical contractor who performed electrical work in the City of New Orleans was required to obtain a license from the City of New Orleans Department of Safety and Permits ("Safety and Permits"), which maintained its offices in New Orleans. Safety and Permits was responsible for ensuring that safety standards are met for construction and use of buildings and properties in New Orleans.

5.     Certain construction work could only be conducted after a licensed contractor applied for and received a permit from the City of New Orleans. City Ordinance Ch. 26 § 15:105. A licensed electrician was required to be present at all times during the electrical work approved by a permit. City Ordinance Ch. 26 § 15:2705.

6.     Licensed electricians performing electrical work were required to apply for a permit from Safety and Permits and pay a fee for each permit. City Ordinance Ch. 26 § 15:105.1. The licensed electrician was required to obtain the permit before performing the work. City Ordinance Ch. 26 § 15:105.1. Permit fees were increased with a penalty for work performed before a permit was issued. City Ordinance Ch. 26 § 15:109.2.

7.     Licensed Electrician 1, Licensed Electrician 2, and Licensed Electrician 3 were electricians who held electrical licenses with Safety and Permits.

2

8.     Each application for a permit, with the corresponding fee, had to be submitted to Safety and Permits. Safety and Permits personnel deposited the funds for each permit application into a bank account at Chase.

9.     At certain points during construction, and when construction was complete, the licensed electrician was required to obtain an inspection. City Ordinance Ch. 26 § 15:110. For certain types of inspections, such as electrical, plumbing, and mechanical inspections, the inspector had to inspect the work while the walls of a building were open, which was called a "rough-in" inspection, because once the walls were closed in, many components of the work were no longer visible for inspection.

10.     The inspection could be performed by either Safety and Permits or a licensed third-party inspection company. City Ordinance Ch. 26 § 15:110.10. When Safety and Permits performed the inspection, there was no additional cost for the inspection, because it was included with the cost of the permit. City Ordinance Ch. 26 § 15:109.6.

11.     When a third-party inspection company performed an electrical inspection, it charged additional fees beyond what the licensed electrician already paid to Safety and Permits. Third-party inspection companies were required to include in the inspection report the name and license number of the licensed electrician performing the work, as well as photographs of the inspected work. City Ordinance Ch. 26 § 15:110.10(2)(a).

12.     Safety and Permits maintained a website, called One Stop, that contained information about permits and inspections in the City of New Orleans. Licensed electricians used One Stop to submit applications for permits and check details about ongoing projects, such as permit application status and inspection dates. Employees of Safety and Permits, as well as other employees of the City of New Orleans, used One Stop to see details about past and current permits

and inspections. Members of the public, including homeowners and prospective homebuyers, also used One Stop to review past and current permits and related data, including the names of the licensed electricians and the dates and results of inspections.

13.   Several parties relied on the permitting and inspection records in One Stop:

a) Homeowners relied on the permitting and inspection records to ensure that construction work on their properties, including electrical work, was performed by licensed electricians and others who complied with safety codes, to ensure the safety of the homeowners, their family members, and others who entered their residences.

b) Homebuyers relied on permitting and inspection records to ensure that they were buying homes with safe wiring installed by licensed electricians and reviewed by honest inspectors and that that they paid a fair price for a home.

c) Parties with financial interests in a home, such as mortgage lenders, relied on the permitting and inspection records to ensure that they could accurately assess the value of a home.

d) Insurance companies relied on the permitting and inspection records to ensure that homes did not include hidden risks, such as the risk of electrical fires posed by electrical work that did not comply with applicable codes.

14.   **IECI** inspectors were individually authorized under Louisiana Revised Statute 40:1730.23 to perform third-party inspections in several Louisiana parishes. In the City of New Orleans, **IECI** and **FARRELL** were registered to perform inspections under City Ordinance Chapter 26 Section 15:110.10. As such, **FARRELL** and **IECI** were agents of the City of New

Orleans. When **FARRELL** and **IECI** submitted information to Safety and Permits about passed inspections, they submitted the information by email.

15.     **FARRELL**'s registration to perform third-party inspections was issued in or around 2014, and **FARRELL** maintained that registration, with a few short gaps, through in or around December 2022. On or about September 20, 2023, Safety and Permits revoked **FARRELL**'s registration. **IECI** and others employed by **IECI**, however, remained registered to perform third-party inspections, and **FARRELL** continued to supervise the inspectors employed by **IECI** and profit from their work.

16.     When he was a licensed third-party inspector, **FARRELL** was a "public employee" and a "person in a position of public authority" as those terms are defined under the laws of the State of Louisiana. La. Rev. Stat. § 14:118(b).

17.     Public Official 1 was a public official employed by the City of New Orleans. Public Official 1 was a "public employee" and a "person in a position of public authority" as those terms are defined under the laws of the State of Louisiana. La. Rev. Stat. § 14:118(b).

18.     Public Official 2 was a public official employed by the City of New Orleans and reported directly to Public Official 1. Public Official 2 supervised Safety and Permits through a subordinate, Supervisor 1.

19.     Supervisor 1 was a public official employed by the City of New Orleans as the Deputy Chief Administrative Officer for Land Use and oversaw Safety and Permits. Supervisor 1 reported directly to Public Official 2 and reported indirectly to Public Official 1.

20.     Employee 1 was a public official employed by the City of New Orleans as the Deputy Director of Safety and Permits and the Director of One Stop. Employee 1 reported directly to Supervisor 1.

21.     City Inspector 1 was an inspector for Safety and Permits. City Inspector 1 also had a business relationship with **FARRELL**. In or around September 2019, City Inspector 1 was suspended. In or around early 2020, City Inspector 1 retired from the City of New Orleans and then began working for a company that **FARRELL** owned.

22.     Senior Advisor 1 was a public official employed by the City of New Orleans as an advisor to Public Official 1.

23.     Businessman 1 was a business owner in the City of New Orleans. Businessman 1 was also a political supporter of, and donor to, Public Official 1.

24.     Employee 1 used the One Stop system to obtain electronic data about inspections by **FARRELL** and his associates, which enabled City of New Orleans employees and outside investigators to review who performed each inspection in New Orleans. At least as early as June 2019, Employee 1 determined that **IECI** inspected electrical work for jobs despite **IECI** also paying for the permits on those same jobs, which Employee 1 shared with the director of Safety and Permits.

25.     Because **FARRELL**'s inspection company, **IECI**, conducted the majority of the third-party inspections in the City of New Orleans, **FARRELL** regularly interacted with Safety and Permits personnel, and Safety and Permits employees regularly referred contractors to **FARRELL** and **IECI** to obtain inspections instead of using Safety and Permits inspectors.

**B.     THE CONSPIRACY:**

From a date unknown, but at least as early as 2018, and continuing through at least on or about September 20, 2023, in the Eastern District of Louisiana and elsewhere, the defendants, **RANDY A. FARRELL, SR.** and **IECI & ASSOCIATES LLC**, did knowingly and willfully conspire and agree with others known and unknown to the Grand Jury, to devise, and intend to

devise, a scheme and artifice to defraud, and for the purpose of obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, to knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## C.   **PURPOSE OF THE CONSPIRACY:**

It was a purpose of the conspiracy for **FARRELL**, **IECI**, and others to unlawfully enrich themselves by, among other things:

1.      obtaining money by soliciting and receiving payments from unlicensed electricians and then applying for and receiving fraudulent permits in the name of licensed electricians who did not actually perform the work at the addresses listed on the fraudulent permits;

2.      concealing the scheme by submitting fraudulent documents to Safety and Permits in support of fraudulent electrical permits, and by fraudulently causing Safety and Permits records to show passed inspections for properties with electrical work performed by unlicensed electricians, thereby deceiving homeowners, homebuyers, and others who relied on Safety and Permits systems to confirm that electrical work on a given property was performed by a licensed electrician and properly inspected by a third-party inspector; and

3.      deceiving homeowners who paid, directly and indirectly, for electrical work that was supposed to be performed by a licensed electrician and validly inspected, thereby reducing the value of homeowners' properties by providing homeowners with properties that contained electrical systems installed and modified by unlicensed electricians whose work was not validly inspected.

D.     **MANNER AND MEANS:**

Among the manner and means by which **FARRELL** and **IECI** carried out the conspiracy included the following:

1.     **FARRELL** submitted and paid for fraudulent electrical permit applications in the names and license numbers of licensed electricians, knowing that these electricians were not actually performing the work.

2.     To hide the use of the unlicensed electricians, **FARRELL** and **IECI** fraudulently passed electrical inspections for the work performed by the unlicensed electricians and subsequently submitted fraudulent inspection reports. As a result, Safety and Permits records, including the One Stop records visible to the public, were false.

3.     **FARRELL** solicited and accepted bribes from unlicensed electricians in exchange for their participation in **FARRELL**'s fraudulent scheme to evade the permitting and inspection process. Neither **FARRELL** nor **IECI** disclosed the bribes or the scheme to Safety and Permits when submitting the fraudulent permit applications and fraudulent inspection reports.

*Property on Dryades Street*

4.     A property on Dryades Street serves as an example of the scheme by **FARRELL** and **IECI** to evade permitting and inspection laws by letting an unlicensed electrician perform electrical work. In this instance, **FARRELL** was caught and confronted in 2018 by the homeowner who was being deceived by the scheme.

5.     In or around March 2018, owners of a property on Dryades Street hired a general contractor to renovate their home, and the general contractor hired an unlicensed electrician who used **FARRELL** to obtain a fraudulent permit. When the walls of the building were still open, a homeowner saw electrical connections that were unsafe and did not meet electrical code. The

homeowner confronted **FARRELL** about letting the unlicensed electrician perform the work without the licensed electrician. Nonetheless, on or about June 8, 2018, **FARRELL** and **IECI** fraudulently caused the property to pass its electrical inspection. The unlicensed electrical work left the homeowner with a property that contained unsafe electrical connections even after the inspection. This resulted in the homeowner being forced to pay another licensed electrician to fix the unlicensed electrician's unsafe work.

*Fraudulent Permits and Inspections*

6.     On or about August 1, 2018, **FARRELL** caused the submission of a fraudulent permit application in the name of Licensed Electrician 1 for a property that **FARRELL** and Businessman 1 co-owned in New Orleans. In fact, **FARRELL** knew that Licensed Electrician 1 did not work on that job. On or about August 24, 2018, **FARRELL** and **IECI** caused the submission of fraudulent inspection reports passing the rough-in inspection at the property, falsely listing Licensed Electrician 1 on the inspection report.

7.     In total, during the course of the conspiracy, **FARRELL** and **IECI** submitted and caused the submission of at least hundreds of fraudulent permit applications for unlicensed electricians who paid **FARRELL** bribes, and corresponding fraudulent inspection reports, including for the properties listed below.

| Property | Date | Wire | Fraudulent Name on Permit |
|---|---|---|---|
| Alvar St. | 9/30/2019 | Permit application payment | Licensed Electrician 1 |
| | 10/1/2019 | Rough-in inspection email | |
| | 1/31/2020 | Final inspection email | |
| N. Claiborne Ave. | 10/9/2019 | Permit application payment | Licensed Electrician 3 |
| | 10/28/2019 | Rough-in inspection email | |
| | 11/8/2019 | Final inspection email | |
| Dumaine St. | 3/17/2020 | Permit application payment | Licensed Electrician 3 |
| | 5/25/2020 | Final inspection email | |
| Kerlerec St. | 4/23/2020 | Permit application payment | Licensed Electrician 3 |
| | 7/30/2020 | Final inspection email | |

| | | | |
|---|---|---|---|
| N. Robertson St. | 7/8/2020 | Permit application payment | Licensed Electrician 3 |
| | 7/10/2020 | Vacancy repair inspection email | |
| Louque Pl. | 7/1/2020 | Permit application payment | Licensed Electrician 3 |
| | 9/12/2020 | Final inspection email | |
| St. Roch Ave. | 12/10/2020 | Permit application payment | Licensed Electrician 3 |
| | 1/21/2021 | Final inspection email | |
| North Tonti St. | 9/17/2020 | Permit application payment | Licensed Electrician 3 |
| | 1/4/2021 | Rough-in inspection email | |
| Brooklyn Ave. | 2/9/2021 | Permit application payment | Licensed Electrician 2 |
| | 2/10/2021 | Rough-in inspection email | |
| | 4/27/2021 | Final inspection email | |
| N. Villere St. | 4/15/2021 | Permit application payment | Licensed Electrician 2 |
| | 4/15/2021 | Rough-in inspection email | |
| | 10/3/2021 | Final inspection | |

8.      For the property on Dumaine Street, on or about November 18 and 19, 2019, **FARRELL** told the unlicensed contractor by text message to pay him $510 in fees plus $300 for a permit, with possible additional costs. Rather than meeting in person, the unlicensed contractor sent **FARRELL** a photograph of a check for $1,110 made out to **IECI** and told **FARRELL** that the check was at **IECI**'s office. On or about November 22, 2019, **IECI** deposited that check into its Chase bank account. **FARRELL** and **IECI** later caused the fraudulent submission of an electrical permit application for a property on Dumaine Street in the name and license number of Licensed Electrician 3.

9.      For the property on Brooklyn Avenue, on or about February 2, 2021, **FARRELL** exchanged text messages with an unlicensed contractor who requested both a filed permit and an inspection. **FARRELL** told the unlicensed contractor to meet **FARRELL** at **FARRELL**'s home address, not the job site. On or about February 4, 2021, the unlicensed contractor sent **FARRELL** a photograph of a key lock box and a code for the property. On or about February 9, 2021, **FARRELL** and **IECI** caused the submission of a fraudulent electrical permit application in the name of Licensed Electrician 2, and the next day, **FARRELL** and **IECI** fraudulently passed the

rough-in inspection for the property. That same day, the unlicensed contractor asked **FARRELL**, "Where can we meet to give you the $650.00 check for [address redacted] Brooklyn?"

10.     On or about April 26, 2021, the unlicensed contractor working on the Brooklyn Avenue property sent **FARRELL** a text message requesting a final electrical inspection, and **FARRELL** responded that an employee of **IECI** would "run by today." **FARRELL** told the unlicensed contractor that the location needed additional work performed. The unlicensed contractor responded to **FARRELL** on or about April 29, 2021, by sending photographs of electrical wiring and stating, "I addressed the 2 issues at [address] Brooklyn. Can you final it out for me please?" However, two days before the unlicensed contractor responded, on or about April 27, 2021, **IECI** had already caused the Brooklyn Avenue property to fraudulently pass its final electrical inspection.

*Removal of Employee 1*

11.     In 2018 and 2019, **FARRELL** worked with Businessman 1 to provide Public Official 1 with items of value, including tickets to New Orleans Saints games, an iPhone, and a meal at a steakhouse. **FARRELL** asked Businessman 1 to speak to Public Official 1 about terminating Employee 1.

12.     On or about December 23, 2018, **FARRELL** and Businessman 1 discussed asking Public Official 1 to terminate Employee 1. **FARRELL** paid approximately $875 to purchase two tickets for Public Official 1 and Businessman 1 to attend a football game between the New Orleans Saints and the Pittsburgh Steelers. That same day, Businessman 1 texted **FARRELL** that Public Official 1 "appreciate[d] it." In response, **FARRELL** asked Businessman 1 to "talk to [Public Official 1] about what I asked please," and Businessman 1 promised to "do everything in my power today to talk to [Public Official 1] about this issue at the game." **FARRELL** repeated that "She's

need to go." **FARRELL** added, "cause otherwise, I am not gonna support [Public Official 1] no more. This is the only thing we asked of [Public Official 1]." That same day, Businessman 1 texted **FARRELL** a photograph of Businessman 1 and Public Official 1 together at the Saints game.

13.     On or about December 27, 2018, **FARRELL** and Businessman 1 again discussed asking Public Official 1 to terminate Employee 1. **FARRELL** reiterated to Businessman 1, "Tell [Public Official 1] just a reminder to can that bitch," and Businessman 1 responded "I'm going to see [Public Official 1] tonight[.] I promise you Randy I'm working hard on this issue." **FARRELL** said, "This should be easy for [Public Official 1] to make happen. Since she's not civil service she's appointed."

14.     On or about January 16, 2019, **FARRELL** purchased tickets for Public Official 1 to attend the New Orleans Saints' NFC championship game. When **FARRELL** asked Businessman 1 how many tickets **FARRELL** needed to buy, Businessman 1 responded that **FARRELL** needed to purchase seven tickets for Public Official 1's "family and for Chief of Staff." In total, **FARRELL** sent Businessman 1 seventeen tickets to the game for Public Official 1 and others, purchased for a total of approximately $5,919.75. The same day, Businessman 1 warned **FARRELL**, "I don't want to say too much in the phone." Businessman 1 continued, "you know what my objective is and you know what my most important person is you you're my intention to make my hero you going to be very OK." **FARRELL** responded, "We got it." After **FARRELL** provided the requested tickets to Businessman 1 for Public Official 1 to attend the NFC Championship game, Businessman 1 responded, "I'm working very hard to keep my brother one day in good standing with everything." In another text, Businessman 1 continued, "I'm working on making you the king of the city of New Orleans and I'll be the assistant king." **FARRELL** replied, "Just get [Public Official 1] to get her out, and we will be Kings with Safety

and Permits." **FARRELL** continued, "That woman is still up there." Businessman 1 agreed, saying "I promise you my brother you are right hundred percent and that's my objective and this is my promise she will be gone sooner than you think."

15.     On or about January 25, 2019, **FARRELL** texted Businessman 1, "that woman still up at City Hall nothing going on with her yet about [Public Official 1] was going to move her somewhere Zells [sic]." Businessman 1 responded, "I'm going to see [Public Official 1] 11 o'clock this morning because of that I promise you."

16.     On or about April 18, 2019, Businessman 1 told **FARRELL** that Businessman 1 spoke to Public Official 1 about a Safety and Permits employee, and Businessman 1 requested a face-to-face conversation with Public Official 1 in the near future. On or about April 26, 2019, Businessman 1 told **FARRELL** that Businessman 1 just spoke with Public Official 1 and needed to speak to **FARRELL**.

17.     On or about July 23, 2019, **FARRELL** and Businessman 1 met with Public Official 1 at a public event.

18.     On or about August 14, 2019, **FARRELL** and Businessman 1 went to lunch at a steakhouse in downtown New Orleans with Public Official 1, Senior Advisor 1, and two others. At the lunch, **FARRELL** complained to Public Official 1 about Employee 1. **FARRELL** again encouraged Public Official 1 to remove Employee 1.

19.     **FARRELL** paid the entire $831.17 bill at the steakhouse.

20.     On or about August 15, 2019, Public Official 1 instructed Supervisor 1 to convene a meeting of Safety and Permits' inspectors and building officials. Supervisor 1 instructed Employee 1 and a coworker to arrange the meeting, but Employee 1 was not invited to attend.

When Employee 1 sent the electronic meeting invitation to the Safety and Permits inspectors, City Inspector 1 forwarded the invitation to **FARRELL**, who accepted the meeting invitation.

21.     On or about August 19, 2019, Public Official 1 met with several Safety and Permits employees and then texted Businessman 1, "I met with [City Inspector 1] and the group today!"

22.     After these meetings, Public Official 1 instructed Supervisor 1 to terminate Employee 1. Supervisor 1 did not terminate Employee 1 but instead, Supervisor 1 allowed Employee 1 to begin taking vacation days that Employee 1 had available.

23.     On or about August 22, 2019, **FARRELL** received via text message an image of a City of New Orleans email showing Employee 1's automated out-of-office reply, which stated that Employee 1 no longer worked for One Stop or Safety and Permits. **FARRELL** forwarded the image to Businessman 1 with the comment, "THE BITCH IS GONE!!!!!!" That same day, Businessman 1 texted Public Official 1, "you are a [person] of your word," and continued, "thank you so much for handling safety and permit problem[.]"

24.     Public Official 1 later learned that Employee 1 had not been terminated. On or about August 30, 2019, Public Official 1 again instructed Supervisor 1 to terminate Employee 1. Supervisor 1 refused to terminate Employee 1, and Supervisor 1 resigned from the City of New Orleans. On or about November 16, 2019, Employee 1 ran out of vacation days and resigned.

*Interactions with City Officials*

25.     On or about August 28, 2019, less than one week after Employee 1 was removed, the director of Safety and Permits froze the One Stop credentials for Licensed Electrician 1, preventing Licensed Electrician 1 from applying for permits. In response, on or about September 4, 2019, **FARRELL** caused an email to be sent to the director of Safety and Permits, purportedly written by Licensed Electrician 1. The email alleged that Licensed Electrician 1's credentials were

14

frozen as retaliation related to Public Official 1's directing the termination of Employee 1. The email stated that Licensed Electrician 1 would "be filing a formal complaint with [Public Official 1]'s office."

26.   After Licensed Electrician 1 was suspended from applying for new permits, in about August 2019, **FARRELL** and **IECI** shifted to using the licenses of Licensed Electrician 2 and Licensed Electrician 3 to continue the same fraudulent permitting and inspections scheme.

27.   On or about September 6, 2019, **FARRELL** caused a letter with similar allegations, signed by Licensed Electrician 1 but written by someone else, to be sent to the director of Safety and Permits and Public Official 1. The letter asserted that Licensed Electrician 1 was suspended because "my friend and associate had the fortitude to expose the significant professional shortcomings" of Employee 1 "in a meeting with [Public Official 1]."

28.   That same day, **FARRELL** texted Businessman 1 to request the email and phone number for Senior Advisor 1 because **FARRELL** wanted Senior Advisor 1 to show the letter to Public Official 1.

29.   On or about September 9, 2019, the director of Safety and Permits requested a meeting with Licensed Electrician 1 to learn how Licensed Electrician 1 could have performed the high volume of work reflected in the One Stop permit records.

30.   That same day, the director of Safety and Permits sent an email to Public Official 2 explaining that Licensed Electrician 1 had received an unusually large number of permits, all approved by third-party inspectors, and requesting Public Official 2 to initiate an independent investigation conducted by someone outside of Safety and Permits. The director of Safety and Permits expected to seek a suspension hearing for License Electrician 1 in the future.

31.     On or about September 11, 2019, the director of Safety and Permits requested that Licensed Electrician 1 provide information and documentation about permit applications, number and identity of licensed employees, and contracts for the jobs reflected in License Electrician 1's permit applications. The director of Safety and Permits also granted Licensed Electrician 1's request to unfreeze his credentials while Licensed Electrician 1 gathered the requested information and documentation.

32.     In response to the requests from Safety and Permits, Licensed Electrician 1 and **FARRELL** met in **FARRELL**'s office at **IECI** and created fake documents to make it appear as though Licensed Electrician 1 had performed work on over fifty properties when, in fact, Licensed Electrician 1 was not involved in the work. **FARRELL** provided Licensed Electrician 1 with the details about each job because Licensed Electrician 1 did not actually work on those jobs.

33.     On or about October 15, 2019, **FARRELL** caused an attorney to provide the fake documents he and Licensed Electrician 1 created to the director of Safety and Permits.

34.     On or about October 30, 2019, the director of Safety and Permits repeated the request to the attorney for Licensed Electrician 1 to provide the remaining information and documents requested on September 10, 2019, including the identities of any others who assisted Licensed Electrician 1 with the jobs reflected in the documents submitted on October 15, 2019.

35.     On or about November 11, 2019, Public Official 2 asked Businessman 1 for three tickets to the College Football Playoff National Championship Game on January 13, 2020. On or about November 12, 2019, Businessman 1 responded, "Consider it done."

36.     On or about December 4, 2019, the director of Safety and Permits sent an email to the attorney for Licensed Electrician 1, indicating that if Safety and Permits did not receive the

requested information and documents by December 13, 2019, then Licensed Electrician 1's One Stop credentials would be frozen again and a hearing would be scheduled to revoke the license.

37.     On or about December 6, 2019, Businessman 1 met with Public Official 2. At approximately 1:09 pm, Businessman 1 sent **FARRELL** a photograph of Businessman 1 standing next to Public Official 2. At approximately 1:24 pm, **FARRELL** responded by texting Businessman 1 the name and business of Licensed Electrician 1.

38.     That same day, **FARRELL** purchased four tickets to a New Orleans Saints game on December 8, 2019. **FARRELL** paid approximately $1,160 for the tickets. Businessman 1 gave three of the tickets to Public Official 2 the next day and attended the game with Public Official 2 and two members of Public Official 2's family.

39.     On December 24, 2019, Businessman 1 texted **FARRELL** a photograph of Businessman 1 with Public Official 1 and several of Public Official 1's family members in Lakeside Mall. **FARRELL** responded by asking Businessman 1 to tell Public Official 1, "Merry Christmas." Businessman 1 responded, "It's all good my brother[.] I have good news[.] I tell you about it and everybody say hello you and nothing to worry."

40.     That same day, Businessman 1 used **FARRELL**'s credit card to purchase an iPhone for Public Official 1 at an electronics store in Metairie. The total charge on **FARRELL**'s credit card was $1,584.59. The iPhone was returned on or about January 6, 2020.

41.     On or about January 6, 2020, Public Official 2 contacted Businessman 1 about the January 13, 2020, College Football National Championship Game, and Businessman 1 responded, "I'm trying to get them for you before Friday." On or about January 12, 2020, **FARRELL** sent Businessman 1 three tickets to the game, and Businessman 1 sent them to Public Official 2. **FARRELL** paid approximately $3,619.33 for the tickets.

42.     From on or about July 31, 2020, through at least on or about March 10, 2021, **FARRELL**, directly and indirectly, provided and attempted to provide things of value to Senior Advisor 1, including free demolition work at a property owned by Senior Advisor 1 and stays at hotels.

43.     On or about December 15, 2020, **FARRELL** applied to the City of New Orleans to renew his registration as a third-party inspector for **IECI**. On or about December 17, 2020, Safety and Permits received **IECI**'s payment for **FARRELL**'s renewal.

44.     **FARRELL** continued to renew his registration as a third-party inspector for **IECI** until on or about September 21, 2023, when the director of Safety and Permits denied **FARRELL**'s final renewal application. When **FARRELL** received notice of the denial, he responded the same day by email, asserting that he was being blamed for his role in causing Public Official 1 to remove Employee 1. **FARRELL** copied Public Official 1 on the email.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2 THROUGH 21
(Wire Fraud)

**A.     AT ALL TIMES MATERIAL HEREIN:**

The allegations contained in Count 1 are re-alleged and incorporated as if fully set forth herein.

**B.     THE SCHEME AND ARTIFICE TO DEFRAUD:**

From a date unknown, but at least as early as 2018, and continuing through at least on or about September 20, 2023, in the Eastern District of Louisiana and elsewhere, **RANDY A. FARRELL, SR.** and **IECI & ASSOCIATES LLC** did knowingly devise and intend to devise a scheme and artifice to defraud and obtain money and property by means of false and fraudulent pretenses, representations, and promises, namely, accepting payments to file fraudulent documents

18

with Safety and Permits thereby reducing the value of homeowners' properties by leaving them with properties that contained electrical systems installed and modified by unlicensed electricians whose work was not validly inspected.

**C.   MANNER AND MEANS:**

Parts A, C, and D of Count 1 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

**D.   THE OFFENSES:**

On or about the dates listed below, in the Eastern District of Louisiana and elsewhere, **RANDY A. FARRELL, SR.** and **IECI & ASSOCIATES LLC**, for the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud and to obtain money, funds and property by means of false and fraudulent pretenses, representations and promises, did knowingly transmit and cause to be transmitted in interstate commerce certain writings, signs, signals and sounds by means of wire communications, namely payments for fraudulent permits and email communications regarding fraudulent inspections listed below:

| Count | Date | Property | Wire |
|---|---|---|---|
| 2 | 9/30/2019 | Alvar St. | Permit application payment |
| 3 | 10/9/2019 | N. Claiborne Ave. | Permit application payment |
| 4 | 3/17/2020 | Dumaine St. | Permit application payment |
| 5 | 5/25/2020 | Dumaine St. | Final inspection email |
| 6 | 4/23/2020 | Kerlerec St. | Permit application payment |
| 7 | 7/30/2020 | Kerlerec St. | Final inspection email |
| 8 | 7/8/2020 | N. Robertson St. | Permit application payment |
| 9 | 7/10/2020 | N. Robertson St. | Vacancy repair inspection email |
| 10 | 7/1/2020 | Louque Pl. | Permit application payment |
| 11 | 9/12/2020 | Louque Pl. | Final inspection email |
| 12 | 12/10/2020 | St. Roch Ave. | Permit application payment |
| 13 | 1/21/2021 | St. Roch Ave. | Final inspection email |
| 14 | 9/17/2020 | North Tonti St. | Permit application payment |
| 15 | 1/4/2021 | North Tonti St. | Rough-in inspection email |
| 16 | 2/9/2021 | Brooklyn Ave. | Permit application payment |
| 17 | 2/10/2021 | Brooklyn Ave. | Rough-in inspection email |
| 18 | 4/27/2021 | Brooklyn Ave. | Final inspection email |

| 19 | 4/15/2021 | N. Villere St. | Permit application payment |
| 20 | 4/15/2021 | N. Villere St. | Rough-in inspection email |
| 21 | 10/3/2021 | N. Villere St. | Final inspection email |

All in violation of Title 18, United States Code, Section 1343.

## COUNT 22
(Conspiracy to Commit Honest Services Fraud)

**A.**    **AT ALL TIMES MATERIAL HEREIN:**

The allegations contained in paragraph A of Count 1 are re-alleged and incorporated as if fully set forth herein.

**B.**    **THE CONSPIRACY:**

From a date unknown, but at least as early as 2018, and continuing through at least on or about September 20, 2023, in the Eastern District of Louisiana and elsewhere, the defendants, **RANDY A. FARRELL, SR.** and **IECI & ASSOCIATES LLC**, did knowingly and willfully conspire and agree with others known and unknown to the Grand Jury, to devise, and intend to devise, a scheme to deprive the citizens of the City of New Orleans of the intangible right to honest services through:

a.    soliciting and accepting bribes and kickbacks to apply for and receive permits in the names of licensed electricians and to cause the submission of fraudulent inspection reports despite knowing that work was not performed by the listed licensed electricians; and

b.    offering and paying bribes and kickbacks to public officials with the intent to influence those public officials in the performance of official acts;

and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Sections 1343 and 1346.

C.      **PURPOSE OF THE CONSPIRACY:**

It was a purpose of the conspiracy for **FARRELL, IECI**, and others to unlawfully enrich themselves by, among other things:

1.      obtaining money by soliciting and receiving payments from unlicensed electricians and then applying for and receiving fraudulent permits in the name of licensed electricians who did not actually perform the work at the addresses listed on the fraudulent permits;

2.      concealing the scheme by submitting fraudulent documents to Safety and Permits in support of fraudulent electrical permits, and by fraudulently causing Safety and Permits records to show passed inspections for properties with electrical work performed by unlicensed electricians, thereby deceiving the homeowners, homebuyers, and others who relied on Safety and Permits systems to confirm that electrical work on a given property was performed by a licensed electrician and properly inspected by a third-party inspector;

3.      deceiving homeowners who paid, directly or indirectly, for electrical work that was supposed to be performed by licensed electricians and validly inspected, thereby reducing the value of homeowners' properties by providing homeowners with properties that contained electrical systems installed and modified by unlicensed electricians whose work was not validly inspected;

4.      offering and providing things of value to public officials with the intent to influence those public officials to ensure that **FARRELL** and other **IECI** inspectors retained their registrations with Safety and Permits to perform third-party inspections;

5.      offering and providing things of value to public officials with the intent to influence those public officials to prevent and reduce scrutiny of the fraudulent inspection scheme, including

by inducing Public Official 1 to cause the removal of Employee 1 and by thwarting investigations and inquiries regarding Licensed Electrician 1.

**D.**     **MANNER AND MEANS:**

The Manner and Means section in Part D of Count 1 of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

All in violation of Title 18, United States Code, Section 1349.

**COUNT 23**
(Honest Services Fraud)

**A.**     **AT ALL TIMES MATERIAL HEREIN:**

The allegations contained in Counts 1 and 22 are re-alleged and incorporated as if fully set forth herein.

**B.**     **THE SCHEME:**

From a date unknown, but at least as early as 2018, and continuing through at least on or about September 30, 2023, in the Eastern District of Louisiana and elsewhere, the defendant, **RANDY A. FARRELL, SR.**, devised and intended to devise a scheme to deprive the citizens of the City of New Orleans of the intangible right to honest services through soliciting and accepting bribes and kickbacks, that is soliciting and accepting bribes and kickbacks to apply for fraudulent permits and to cause the submission of fraudulent inspection reports despite knowing that the work was not performed by the listed licensed electrician; and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Sections 1343 and 1346. '

C.    **THE OFFENSE:**

On or about November 22, 2019, in the Eastern District of Louisiana, the defendant,

**RANDY A. FARRELL, SR.,** for the purpose of executing the scheme described above, and

attempting to do so, caused to be transmitted by means of wire communication in interstate

commerce writings, signs, and signals, to wit, electronic communications with a Chase account

regarding the deposit of a check for $1,110.00 from a contractor into **IECI**'s Chase account

x1586.

All in violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNTS 24-25
(Honest Services Fraud)

D.    **AT ALL TIMES MATERIAL HEREIN:**

The allegations contained in Counts 1 and 22 are re-alleged and incorporated as if fully

set forth herein.

E.    **THE SCHEME:**

From a date unknown, but at least as early as 2018, and continuing through at least on

or about September 30, 2023, in the Eastern District of Louisiana and elsewhere, the defendant,

**RANDY A. FARRELL, SR.,** devised and intended to devise a scheme to deprive the citizens

of the City of New Orleans of the intangible right to honest services through offering and paying

bribes and kickbacks, that is offering and paying bribes and kickbacks to public officials with

the intent to influence those public officials in the performance of official acts; and for the

purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted

by means of wire communication in interstate commerce, certain writings, signs, signals,

pictures, and sounds, in violation of Title 18, United States Code, Sections 1343 and 1346.

F.      **THE OFFENSES:**

On or about the dates listed below, in the Eastern District of Louisiana, the defendant,

**RANDY A. FARRELL, SR.,** for the purpose of executing the scheme described above, and

attempting to do so, caused to be transmitted by means of wire communication in interstate

commerce writings, signs, and signals, to wit, electronic communications with a Chase account

regarding the following transactions:

| Count | Date | Wire |
|---|---|---|
| 24 | 12/6/2019 | Purchase of New Orleans Saints football tickets costing $1,160.00, from **FARRELL**'s Chase account x4561, for Public Official 2 |
| 25 | 1/8/2020 | Purchase of College Football National Championship tickets costing $3,619.33, from **FARRELL**'s Chase account x4561, for Public Official 2 |

All in violation of Title 18, United States Code, Sections 1343 and 1346.

### NOTICE OF FORFEITURE

1.      The allegations of Counts 1-25 of this Indictment are incorporated by reference as

though set forth fully herein for the purpose of alleging forfeiture to the United States.

2.      As a result of the offenses alleged in Counts 1-25 for the defendant **RANDY A.**

**FARRELL, SR.** and Counts 1-22 for defendant **IECI,** shall forfeit to the United States pursuant

to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section

2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to

said offenses.

3.      If any of the property subject to forfeiture, as a result of any act or omission of the

defendants:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third person;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be subdivided without difficulty;

the United States shall seek a money judgment and, pursuant to Title 21, United States Code, Section 853(p), forfeiture of any other property of the defendants up to the value of said property.

A TRUE BILL:

MICHAEL M. SIMPSON
Attorney for the United States
Acting under the Authority Conferred
by 28 U.S.C. § 515

NICHOLAS D. MOSES
Assistant United States Attorney

New Orleans, Louisiana
September 27, 2024

FORM OBD-34

No. _____

# UNITED STATES DISTRICT COURT

Eastern _____ District of _____ Louisiana

Criminal _____ Division

## THE UNITED STATES OF AMERICA

vs.

### RANDY A. FARRELL, SR.
### IECI & ASSOCIATES LLC

## INDICTMENT

INDICTMENT FOR CONSPIRACY TO COMMIT
WIRE FRAUD, CONSPIRACY TO COMMIT
HONEST SERVICES FRAUD, WIRE FRAUD,
AND HONEST SERVICES FRAUD

**VIOLATIONS:**     18 U.S.C. §§ 1343, 1346, & 1349

A true ███████

_____

Filed in open court this _____ day of
_____, A.D. 2024.

_____
Clerk

Bail, $ _____

_____
NICHOLAS D. MOSES
Assistant United States Attorney